Ovila Lajoie, executor, *vs.* Albert D. Milliken & others.

Middlesex.    February 14, 15, 1922. — September 19, 1922.

Present: Rugg, C.J., Braley, De Courcy, Crosby, & Carroll, JJ.

*Pleading, Civil,* Replication. *Statute,* Construction. *Public Officer. Federal Fuel Administration. Lever Act. Coal. Constitutional Law,* Police power, Exigencies of war. *World War. Evidence,* Competency, Judicial notice, Presumptions and burden of proof. *Conspiracy. Duress. Trespass.*

Where, in an action of tort against several defendants for trespass *quare clausum fregit* and damages resulting from alleged unlawful acts of the defendants acting in a conspiracy, the defendants in their answers justified their conduct on the ground that it was assented to and approved of by the plaintiff, and the plaintiff filed a "replication" averring that any such consent or approval on his part was induced by duress exerted upon him by the defendants, this court *stated* that in the circumstances it was not necessary to decide whether a replication was necessary as setting up special equitable avoidance of matters pleaded in the answers.

Upon exceptions by the plaintiff to rulings ordering verdicts for the defendants in an action by a retail coal dealer against the New England and Massachusetts Fuel Administrator, the Fuel Committee of Lowell and several coal dealers for damages resulting from acts of the defendants in the first five months of 1918 destructive of the plaintiff's business and alleged by him to have been done illegally and in accordance with an unlawful conspiracy, where the defendants sought to justify their acts as done under and in accordance with the provisions of the Lever Act, 40 U. S. Sts. at Large, 276, 284, this court took judicial notice of the facts, extraneous to the record, that the acts of the defendants occurred during the period when the United States was engaged in the World War and was struggling to maintain its existence and to do its share in overcoming its enemies; that the manufacture and transportation of supplies and munitions of war and the moving of soldiers overseas, with innumerable incidental and allied activities, caused among other abnormal conditions a great shortage of domestic coal, especially in this part of the country, and that there were also an extraordinarily heavy fall of snow and extreme cold weather lasting for several weeks during the winter of 1917–1918.

The declared purpose of a legislative enactment is to be accepted as true unless such declaration is incompatible with the meaning and effect of the act.

There is no rational ground for doubting that the purpose of the Lever Act, as declared in its title and in its first section, was true and genuine.

The broad grants of war powers to the Federal Government in art. 1, § 8 of the Federal Constitution not only include the matters therein specifically stated but inherently carry with them subsidiary facilities to deal comprehensively with all exigencies created by war or arising from its inception, progress and termination.

While the existence of war does not suspend nor affect the operation upon the power of Congress of the guaranties and limitations of art. 5 of the Amendments to the Federal Constitution to the effect that "No person shall . . . be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation; nor shall private property be taken for public use without due process of law," a state of war may affect with a public interest, in those parts of the country where there is not an actual state of war and where the courts are open for the administration of justice, articles, which under normal conditions are free to commerce in its usual channels, and thus may render subject to governmental regulation that which otherwise would be unobstructed and unhindered by the law; and in such circumstances the war powers of the Federal Government would be at least as extensive as the police power of the several States.

In this climate and in the present state of economic art and invention as to production of heat, light and power, the public regulation of the sale, shipment, distribution and apportionment of coal during war is among the powers conferred upon Congress by the Constitution; and therefore the main purpose of the Lever Act in its provisions as to fuel is not open to successful attack.

Those provisions of § 4 of the Lever Act which were held unconstitutional in *United States* v. *Cohen Grocery Co.* 255 U. S. 81, were separable from and did not affect the constitutionality of §§ 1, 2, 25 of the act relating to the regulation of the production, transportation, sale and distribution of fuel.

The appointment by the President of the United States on August 23, 1917, of a United States Fuel Administrator to supervise, direct and carry into effect the provisions of the Lever Act so far as they applied to fuel, and the appointment by such United States Fuel Administrator of a Federal Fuel Administrator for New England and for Massachusetts, and by the administrator for Massachusetts of a Fuel Committee for the city of Lowell conformed to the provisions of § 2 of the statute and did not contravene the provisions of art. 2, § 2 of the Federal Constitution, it being manifest that the President could not attend in person to the execution of the Lever Act and that he must act through representatives.

The declaration in an action of tort by a retail coal dealer in Lowell against three other coal dealers, the Federal Fuel Administrator for New England and for Massachusetts, appointed by the United States Fuel Administrator, who had received his appointment from the President under the provisions of the Lever Act, 40 U. S. Sts. at Large, 276, and the members of the Lowell Fuel Committee, appointed by the Massachusetts administrator, was in two counts, one for trespass *quare clausum fregit,* and one for damages resulting from acts of the defendants committed in the first five, and chiefly during the first three, months of 1918 and alleged to have been committed pursuant to an unlawful conspiracy. At the trial, it appeared that the winter of 1917–1918 was excep-

tionally severe, that on January 1, 1918, there was a great shortage of coal in Lowell and dealers other than the plaintiff had very little coal, while the plaintiff had five thousand tons in his yard and twelve hundred and eighty tons consigned to him and in transit; that it would have taken many months for the plaintiff to have supplied the poignant needs of many small users; that on January 1 the plaintiff's son signed in the name of the plaintiff an order directing the railroad corporation to deliver all shipments of anthracite coal consigned to the plaintiff to the order of the defendant fuel committee until further notice; that the chairman of the committee had said to the son that, if he did not sign the order, the committee would take steps to stop all coal from coming to the plaintiff; that the plaintiff knew of the order forthwith; that the plaintiff in important particulars did not heed the requests and directions of the fuel committee concerning the conduct of his business; that for that and other reasons coal consigned to the plaintiff was reconsigned to other dealers; that the plaintiff complied with requests of the fuel committee as to sales to be made and prices to be charged because of a belief that, if he failed to do so, his future supply of coal would be curtailed or cut off by the federal government at the instigation of the fuel committee; that the prices the plaintiff thus received were less than he otherwise would have realized; that the plaintiff made no objection to the delivery of coal to other dealers nor to such dealers coming to his yard to get coal, but regularly sent bills and received payment from them for coal taken by them from his yard and from cars formerly consigned to him. While the defendant, the Federal Fuel Administrator for Massachusetts and for New England, devised or approved the general methods used in the supervision and conservation and distribution of coal in Lowell, there was no evidence that he personally did anything with particular respect to the business or property of the plaintiff. *Held,* that

(1) It appearing that the plaintiff's son was clerk and bookkeeper and took care of the office for the plaintiff, gave orders for coal as did the plaintiff and had been in the plaintiff's employ seventeen years, that the plaintiff knew that his son was representing him in conversations with the fuel committee, that the signing by the son of the order to the railroad corporation was known to the plaintiff forthwith, that he made no protest nor denial of its authenticity, validity or scope to any one, and that at the trial he did not deny his son's authority to sign it in his name, the order plainly was admissible in evidence;

(2) Documents showing the appointment of the defendant, the Federal Fuel Administrator for New England and for Massachusetts, and his appointment of the defendants, the Lowell Fuel Committee, were admissible in evidence;

(3) No direct connection between the defendant, the Federal Fuel Administrator for New England and for Massachusetts, and the acts of which the plaintiff complained being shown, and it appearing that in all that he did he was undertaking to perform duties imposed by his appointment under the provisions of the Lever Act, no ground of liability against him was shown;

(4) Letters on stationery of the New England or of the Massachusetts fuel administration with the name of the defendant, the Federal Fuel Administrator for New England and for Massachusetts, printed thereon, but signed by another and not shown to have been sent by such defendant's direction or with his knowledge, were excluded rightly;

(5) It was apparent that the defendants, the fuel committee, were striving with the purpose to prevent suffering and hardship, to preserve the public

health and to promote the general welfare in Lowell by securing so far as possible deliveries of coal in small quantities to those in imminent need and to thwart all efforts of one to gain advantage over others by duplicating orders among several dealers or in any other way, and that in all that they did they proceeded under the presumed authority of the Lever Act;

(6) Every presumption is in favor of innocence of wrongdoing and of the legality of the acts of public officers acting as were the defendants, the fuel committee;

(7) Threats by the defendants, the fuel committee, that, if the plaintiff did not sign the order to the railroad corporation directing delivery of his coal according to the direction of the committee, they would take steps to prevent him from getting coal, did not constitute duress;

(8) The failure of the plaintiff at any time to renounce the order to the railroad corporation signed by his son in his name, although he knew of it forthwith, and his sending of bills for the coal to the persons to whom it was reconsigned and his acceptance of payment therefor constituted a ratification and confirmation of the order by acquiescence and consent even if the signing was not originally authorized;

(9) No cause of action against the fuel committee was shown by reason of prices of coal fixed by them nor the quantities in which they directed that it should be sold;

(10) If the plaintiff doubted the authority of the defendants or their rights in the premises, his remedy was to decline to comply with their suggestions, rather than to obey without protest and then seek to hold them responsible in damages for his losses which in fact flowed from deliberate and free submission to such suggestions;

(11) No cause of action against the fuel committee was shown;

(12) By reason of the plaintiff's own conduct toward the defendants, the other coal dealers, respecting sales and deliveries to them and payments by them, no cause of action against them was shown;

(13) There was no foundation for an action of trespass;

(14) There was no evidence of an unlawful conspiracy among the defendants;

(15) A controversy between the plaintiff and one of the coal dealers as to the weight of one car load of coal sent to the dealer could not be adjudicated in this action;

(16) A ruling excluding the testimony of an expert as to the value of the plaintiff's plant and business on January 1, 1918, rested in the sound discretion of the trial judge, which did not appear to have been abused.

TORT, originally begun by Charles Lajoie and, upon his death after the trial in the Superior Court, continued by the executor of his will, against Albert D. Milliken, Herbert J. Ball, John M. O'Donoghue, Edward Cawley, Daniel T. Sullivan, Horne Coal Company and James J. Storrow. Writ dated February 14, 1920.

The declaration was in two counts. The second count was for trespass *quare clausum fregit.* In the first count the plaintiff alleged that, upon land owned by him in Lowell, he had a large and lucrative business as a retail coal dealer which had been

established for about twenty years, that he had thereon a coal elevator, railroad tracks and connections, storage houses and sheds, stables, scales and other buildings, and all the necessary equipment to carry on a large retail coal business including horses, wagons, automobile trucks, tools, office fixtures, and other implements used in said business; that at the time of the alleged unlawful acts of the defendants, he had many agreements and privileges with coal jobbers and operators to furnish him large quantities of coal to supply his trade and further develop his business; and had in his yard, on cars in the vicinity of his yard and on cars consigned to him about five thousand tons of anthracite coal, and orders from and contracts with his customers for the sale and delivery of that coal; that the defendants Cawley, Sullivan, and Horne Coal Company were retail coal dealers in Lowell, and for many years had competed with the plaintiff and had planned to destroy his business and had united and conspired with the other defendants unlawfully to injure and destroy his business; that in furtherance of such conspiracy and unlawful agreement the defendants themselves or through their servants or agents on many days and times from December 26, 1917, to July 1, 1918, "with force and arms broke and entered upon the plaintiff's said land and occupied the same with horses, wagons and automobiles and carried away plaintiff's coal which was on his land and the coal which was on cars on or near his premises and his coal which was in transit, and the said defendants prevented the plaintiff from receiving the coal which he had bought from said jobbers and operators and prevented him from using his said premises . . . that because of the said unlawful acts of the defendants . . . [the plaintiff] was prevented from fulfilling his contracts and the orders of his customers, his plant and equipment remained idle for a long period of time and his said business was utterly ruined and destroyed. . . ."

In their answers, each of the defendants Milliken, Ball, O'Donoghue and Storrow, besides setting up a general denial, justified whatever acts he had committed with relation to the plaintiff as acts of a federal public officer done in pursuance of authority vested in him by law. The other defendants, besides general denials, stated that their entrances upon the plaintiff's premises were at his invitation and with his approbation, and

the defendant Cawley further alleged that he had "paid or tendered payment to the plaintiff on all and several occasions when he received coal from or through the plaintiff and that at no time did the plaintiff object to deliver to him or sell to him, the said defendant, the plaintiff's said coal."

The plaintiff filed a "replication," denying the allegation of the defendants and averring that he "never sold, consented to, nor approved any of the acts committed by the defendants as set forth in the answers of Daniel T. Sullivan, Edward Cawley, and Horne Coal Company; and if any evidence is introduced of acts of the plaintiff tending to show sale, consent or approval then the plaintiff says that said acts were done under duress and were not his free and wilful acts but were done in fear of punishment and threats by the defendants to have plaintiff arrested and threats to destroy his business."

There was a trial in the Superior Court before *Bishop,* J.

It appeared that, on August 23, 1917, the President of the United States issued over his own signature the following executive order:

"By virtue of power conferred upon me under the Act of Congress approved August 10, 1917, entitled 'An Act to provide further for the national security and defense by encouraging the production, conserving the supply, and controlling the distribution of food products and fuel,' and particularly for the purpose of carrying into effect the provision of said Act relating to fuel Harry A. Garfield is hereby designated and appointed United States Fuel Administrator to hold office during the pleasure of the President.

"Said Fuel Administrator shall supervise, direct and carry into effect the provisions of said Act and the powers and authority therein given to President so far as same apply to fuel as set forth in said Act, and to any and all practises, procedure and regulations authorized under the provisions of said Act applicable to fuel, including the issuance, regulation and revocation under the name of said United States Fuel Administrator of licenses under said Act. In this behalf he shall do and perform such acts and things as may be authorized and required of him from time to time by direction of the President and under such rules and regulations as may be prescribed.

"Said fuel administrator shall also have the authority to em-

ploy such assistants and subordinates, including such counsel as may from time to time be deemed by him necessary and to fix the compensation of such assistants, subordinates and counsel.

"All departments and established agencies of the Government are hereby directed to co-operate with the United States Fuel Administrator in the performance of his duties as herein before set forth."

It further appeared that on September 28, 1917, Mr. Garfield as United States Fuel Administrator and purporting to act under the authority and in furtherance of the executive order of the President above set out, and with the approval of the President designated and appointed "James J. Storrow of Boston, Massachusetts, Federal Fuel Administrator for New England to hold office during the pleasure of the United States Fuel Administrator. Said Federal Fuel Administrator for New England shall, subject to the provisions of said Act of Congress and to orders, rules and regulations from time to time prescribed by the President of the United States or the United States Fuel Administrator, have power and authority in respect to coal and coke within said New England to fix and approve retail prices and gross margins to be charged by dealers, to prescribe and administer reasonable rules for the regulation of the sale, shipment, distribution, apportionment, storage and conservation of coal and coke within said New England and to perform and do such other acts and things and to exercise such powers as may from time to time be directed, authorized or conferred by the President of the United States or the United States Fuel Administrator. All such prices, gross margins, and regulations shall be subject to modification, revocation or cancellation at any time by the President of the United States or the United States Fuel Administrator. Said Federal Fuel Administrator for New England is authorized to appoint State, County and Local Committees and County and local administrators or other representatives, and to employ such assistants and subordinates as he may deem necessary, and, subject to the approval of the United States Fuel Administrator, to fix the compensation of such assistants and subordinates."

The testimony of an expert, referred to in the opinion as excluded, related to the value of the plaintiff's plant and business on January 1, 1918.

Other material evidence is described in the opinion. At the close of the plaintiff's evidence, the judge ordered verdicts for all of the defendants upon the first count and for the defendants Storrow, O'Donoghue, Milliken and Ball upon the second count; and, at the close of all the evidence, the judge also ordered verdicts for the defendants Cawley, Sullivan and Horne Coal Company upon the second count. The plaintiff alleged exceptions.

Sections 1, 2 and the first four paragraphs of § 25 of the Lever Act, 40 U. S. Sts. at Large, 276, 284, read as follows:

"Chapter 53. An Act To provide further for the national security and defense 'by encouraging the production, conserving the supply, and controlling the distribution of food products and fuel.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That by reason of the existence of a state of war, it is essential to the national security and defense, for the successful prosecution of the war, and for the support and maintenance of the Army and Navy, to assure an adequate supply and equitable distribution, and to facilitate the movement, of foods, feeds, fuel including fuel oil and natural gas, and fertilizer and fertilizer ingredients, tools, utensils, implements, machinery, and equipment required for the actual production of foods, feeds, and fuel, hereafter in this Act called necessaries; to prevent, locally or generally, scarcity, monopolization, hoarding, injurious speculation, manipulations, and private controls, affecting such supply, distribution, and movement; and to establish and maintain governmental control of such necessaries during the war. For such purposes the instrumentalities, means, methods, powers, authorities, duties, obligations, and prohibitions hereinafter set forth are created, established, conferred, and prescribed. The President is authorized to make such regulations and to issue such orders as are essential effectively to carry out the provisions of this Act.

"Section 2. That in carrying out the purposes of this Act the President is authorized to enter into any voluntary arrangements or agreements, to create and use any agency or agencies, to accept the services of any person without compensation, to co-operate with any agency or person, to utilize any department or agency of the Government, and to co-ordinate their activities so as to avoid any preventable loss or duplication of effort or funds."

"Section 25. That the President of the United States shall be, and he is hereby, authorized and empowered, whenever and wherever in his judgment necessary for the efficient prosecution of the war, to fix the price of coal and coke, wherever and whenever sold, either by producer or dealer, to establish rules for the regulation of and to regulate the method of production, sale, shipment, distribution, apportionment, or storage thereof among dealers and consumers, domestic or foreign: said authority and power may be exercised by him in each case through the agency of the Federal Trade Commission during the war or for such part of said time as in his judgment may be necessary.

"That if, in the opinion of the President, any such producer or dealer fails or neglects to conform to such prices or regulations, or to conduct his business efficiently under the regulations and control of the President as aforesaid, or conducts it in a manner prejudicial to the public interest, then the President is hereby authorized and empowered in every such case to requisition and take over the plant, business, and all appurtenances thereof belonging to such producer or dealer as a going concern, and to operate or cause the same to be operated in such manner and through such agency as he may direct during the period of the war or for such part of said time as in his judgment may be necessary.

"That any producer or dealer whose plant, business, and appurtenances shall have been requisitioned or taken over by the President shall be paid a just compensation for the use thereof during the period that the same may be requisitioned or taken over as aforesaid, which compensation the President shall fix or cause to be fixed by the Federal Trade Commission.

"That if the prices so fixed, or if, in the case of the taking over or requisitioning of the mines or business of any such producer or dealer the compensation therefor as determined by the provisions of this Act be not satisfactory to the person or persons entitled to receive the same, such person shall be paid seventy-five per centum of the amount so determined, and shall be entitled to sue the United States to recover such further sum as, added to said seventy-five per centum, will make up such amount as will be just compensation in the manner provided by section twenty-four, paragraph twenty, and section one hundred and forty-five of the Judicial Code."

*H. V. Charbonneau,* for the plaintiff.

*A. A. Schaefer, J. M. O'Donoghue & W. D. Regan,* for the defendants.

RUGG, C.J. This is an action of tort brought by Charles Lajoie, a coal dealer in the city of Lowell, hereafter called the plaintiff, and prosecuted after his death by the executor of his will. The defendants are James J. Storrow, who was the federal fuel administrator both for New England and for Massachusetts, three persons appointed by him as the members of the Lowell fuel committee, and three local coal dealers doing business in the city of Lowell. The declaration contains two counts, the first alleging that the several defendants conspired to destroy the plaintiff's business by doing numerous specified acts averred to be illegal, and the second alleging trespass upon the plaintiff's land and the carrying away of personal property of the plaintiff. Each defendant filed a general denial. The defendant Storrow and the three fuel commissioners of Lowell answered further that each was a public officer of the United States and that all his acts were done pursuant to authority vested in him by law as such officer. Each of the local coal dealers answered further that all their acts were done on the invitation and with the approbation of the plaintiff, his servants and agents. The plaintiff filed a replication, setting up that acts of his tending to show sales to the local dealers or consent to or approval of their acts, if proved, were induced by duress exerted upon him by the defendants. It is not necessary to decide whether a replication was necessary as setting up special equitable avoidance of matters pleaded in the answers. G. L. c. 231, §§ 34, 35, 36. *Comstock* v. *Livingston,* 210 Mass. 581. *De Propper, petitioner,* 236 Mass. 500. *Commonwealth* v. *Kozlowsky,* 238 Mass. 379, 385.

The events on which the right of recovery is founded occurred during the first five months of 1918, and chiefly during the first three months of that year.

There was evidence tending to show these facts: For some years prior to 1918 the plaintiff had conducted a retail coal business in Lowell, and owned real estate and personal property especially adapted for that purpose. On January 1, 1918, he had on storage at his yard about five thousand tons of coal, and on the way to him by transportation thirty-two carloads, containing

about twelve hundred and eighty tons, of coal.  There was a great shortage of coal in Lowell and other dealers had very little coal to meet the demand.  The shortage affected everybody who had not a supply of coal, there were thousands of families of small means who did not have coal, and the winter was exceptionally severe.  It would have taken the plaintiff about sixty-six days to deliver to customers ordering four or five tons each the coal which he had on storage in his yard on January 1, 1918, and until the middle of April to deliver it in ton lots or half or quarter ton lots.  Under date of January 1, 1918, the son of the plaintiff signed in the name of his father an order directing the Boston and Maine Railroad to deliver all shipments of anthracite coal consigned to the plaintiff to the order of the Lowell fuel committee until further notice.  The chairman of the Lowell fuel committee said to the son that, if he did not sign the order, the committee would take steps to stop all coal from coming to the plaintiff.  There was ample evidence of the authority of the son to sign such an order.  The fact of signing it was immediately known to the plaintiff, who made no protest nor denial of its authenticity, validity and scope to the railroad, to the Lowell fuel committee, or to any one else.  The plaintiff did not at the trial deny the authority of his son to sign the order in question and acknowledged that he sent his son to see the local fuel committee.  The order plainly was admissible in evidence.  The son was clerk and bookkeeper and took care of the office for the plaintiff and gave orders for coal as well as the plaintiff, and had been in the plaintiff's employ seventeen years.  The plaintiff knew that his son was representing him in conversations with the fuel committee, but, as he testified, "I was there in case he did something wrong and I was there to break it up then."  The plaintiff in important particulars did not heed the requests and directions of the fuel committee concerning the conduct of his business.  He refused to keep the accounts suggested in order to make certain that coal was distributed in small quantities to families in need and to prevent any from getting more than their equitable proportion, he declined to make reports in the form and at the times requested and he unloaded cars in his own yard after January 1, 1918, desired to be reconsigned to other dealers, all contrary to the declared policy of the fuel committee.  The plaintiff was told

that if he did not do just as the fuel committee wanted with respect to his coal, they had taken steps to prevent him from getting any more coal; that they delivered to him many lists of persons to whom coal was to be delivered; that he could not deliver in accordance with all these orders, which amounted to thousands, because of his lack of equipment; that he was barred in large measure from doing business himself because his yard was filled with people; that he was prevented from receiving any of the coal consigned to him because he did not co-operate with the fuel committee in furnishing data as to whom he delivered coal. Thirty-two carloads of coal originally consigned to the plaintiff were reconsigned to other dealers. The plaintiff complied with requests of the fuel committee as to sales to be made and prices to be charged because of a belief that, if he failed to do so, his future supply of coal would be curtailed or cut off by the Federal Government at the instigation of the fuel committee. The prices for which the plaintiff made sales were less than the value of the coal and less than he could have got but for the acts of the fuel committee. He made no objection to the delivery of coal to other dealers, nor to such dealers coming to his yard to get coal. He regularly sent bills and accepted payments from other dealers for the coal taken by them from his stock or from cars consigned to him. For all coal so taken the plaintiff has been paid according to bills sent by him, except for one carload about the weight of which there is dispute. Treating the testimony of the plaintiff as binding him and disregarding the evidence of the defendants and making every assumption in favor of the plaintiff, the foregoing might have been found to be the facts on the evidence reported.

The defendant Storrow was federal fuel administrator for New England and also for Massachusetts by appointment of the United States fuel administrator by an instrument which purported to authorize him amongst other matters to appoint local committees and local administrators and in general to carry out the policy of the government concerning the conservation and distribution of coal.

While there was nothing to indicate that the defendant Storrow personally did anything with particular respect to the business or property of the plaintiff, it might have been inferred that he de-

vised or approved the general methods of supervising the conservation and distribution of coal prevalent in Lowell.

The defendants O'Donoghue, Ball and Milliken were the Lowell fuel committee appointed by the defendant Storrow. Numerous cars loaded with coal consigned to the plaintiff were by them after January 1, 1918, ordered to be reconsigned to other coal dealers in Lowell. Under their direction plans were carried into execution to ensure so far as possible the delivery of coal in small quantities to families in need and to prevent any from getting more than a fair share with due regard to the needs of others.

The other defendants, being coal dealers in Lowell, went to the yard of the plaintiff for coal or took it by reconsignment to them of cars originally destined for him and paid for it according to bills sent by him, with the exception of the single carload as to the weight of which (as heretofore stated) there was dispute.

All these events occurred during the period when the United States was engaged in the great war and was struggling to maintain its existence and to do its share in overcoming its enemies. The manufacture and transportation of supplies and munitions of war and the moving of soldiers overseas, with innumerable incidental and allied activities, caused among other abnormal conditions a great shortage of domestic coal, especially in this part of the country. There was also an extraordinarily heavy fall of snow and extreme cold weather lasting for several weeks during the winter of 1917–1918. Of these facts, extraneous to the record but of common knowledge, the court will take judicial notice. *Kehlor Flour Mills Co.* v. *Linden*, 230 Mass. 119, 123. *Opinion of the Justices*, 231 Mass. 603, 610. *Underhill* v. *Hernandez*, 168 U. S. 250, 253.

The fuel administrator for New England and for Massachusetts, and the Lowell fuel committee justify their acts by reference to the Lever Act, so called, approved on August 10, 1917, c. 53, 40 U. S. Sts. at Large, 276, 287. It is entitled "An Act to provide further for the national security and defense by encouraging the production, conserving the supply, and controlling the distribution of food products and fuel." The act declares that, by reason of the war, "it is essential to the national security and defense, for the successful prosecution of the war, and for the support and maintenance of the Army and Navy, to assure an adequate supply

and equitable distribution, and to facilitate the movement, of" fuel amongst other articles called "necessaries," "to prevent, locally or generally, scarcity, monopolization, hoarding, injurious speculation, manipulations, and private controls, affecting such supplies, distribution, and movement; and to establish and maintain governmental control of such necessaries during the war." The declared purpose of a legislative enactment is to be accepted as true unless incompatible with its meaning and effect. *S. S. White Dental Manuf. Co.* v. *Commonwealth*, 212 Mass. 35, 40. *Flint* v. *Stone Tracy Co.* 220 U. S. 107, 145. There is no rational ground for doubting that the purpose of the so called Lever Act as thus declared was true and genuine. General authority to enforce the act was conferred upon the President, and in carrying out its purposes he was authorized amongst other matters "to create and use any agency or agencies." By § 25 the President was expressly authorized "to fix the price of coal . . . to establish rules for the regulation of and to regulate the method of production, sale, shipment, distribution, apportionment, or storage thereof among dealers and consumers."

The war powers of the Federal Government are not strictly and narrowly defined. The power is conferred "to declare war . . .; to raise and support armies . . .; to provide and maintain a navy; to make rules for the government and regulation of the land and naval forces . . .; to make all laws which shall be necessary and proper for carrying into execution the foregoing powers." Art. 1, § 8 of the United States Constitution. These are broad grants of extensive power. They include not only those matters specifically stated, but all others reasonably implied as necessary to the execution of the main matter of waging war to a successful conclusion. These powers are not limited to battle on land and sea, in the air and under the waters. They inherently carry with them subsidiary faculties to deal comprehensively with all exigencies created by war or arising from its inception, progress and termination. *Miller* v. *United States,* 11 Wall. 268, 304–314. *Stewart* v. *Kahn*, 11 Wall. 493, 506, 507. *Legal Tender Cases*, 12 Wall. 457. *Hamilton* v. *Dillin*, 21 Wall. 73. *Selective Draft Cases*, 245 U. S. 366. *McKinley* v. *United States*, 249 U. S. 397. *Northern Pacific Railway* v. *North Dakota,* 250 U. S. 135, 149. *Jacob Ruppert* v. *Caffey*, 251 U. S. 264.

The existence of war does not suspend nor affect the operation upon the power of Congress of the guarantees and limitations of the Fifth Amendment to the United States Constitution to the effect that "No person shall . . . be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation," in those parts of the country where there is not an actual state of war and where the courts are open for the administration of justice. *Ex parte Milligan*, 4 Wall. 2, 121, 127. *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 336. *United States* v. *Joint Traffic Association*, 171 U. S. 505, 571. *McCray* v. *United States*, 195 U. S. 27, 61. *United States* v. *Cress*, 243 U. S. 316, 326. *United States* v. *Cohen Grocery Co.* 255 U. S. 81, 88. A state of war, however, may affect with a public interest articles, which under normal conditions are free to commerce in its usual channels, and thus render subject to governmental regulation that which otherwise would be unobstructed and unhindered by the law. The war powers of the Federal Government in such circumstances would at least be as extensive as the police power of the several States. *Hamilton* v. *Kentucky Distilleries Co.* 251 U. S. 146, 156. Fuel is a vital and indispensable necessity. It has been held that its supply and distribution is a public purpose justifying the imposition of taxation for its support and maintenance even in times of peace. *Jones* v. *Portland*, 245 U. S. 217, affirming 113 Maine, 123. See *Opinions of the Justices*, 155 Mass. 598, 601; 182 Mass. 605; art. 47 of Amendments to the Constitution of Massachusetts. The manufacture and transportation of munitions and other necessities of war may require preferences as to fuel not permissible in times of peace. It is not necessary to consider and pass upon the constitutionality of the several parts and details of the Lever Act. It seems to us not open to serious doubt that in this climate and in the present state of economic art and invention as to production of heat, light and power, the public regulation of the sale, shipment, distribution and apportionment of coal during war is among the powers conferred upon Congress by the Constitution. It is sufficient to say that in our opinion the main purpose of the Lever Act in these particulars is not open to successful attack. There can be no question that the war created a public exigency as to coal. As

was said in *German Alliance Ins. Co.* v. *Kansas*, 233 U. S. 389, 411, "A business, by circumstances and its nature, may rise from private to be of public concern and be subject, in consequence, to governmental regulation. . . . 'The underlying principle is that business of certain kinds holds such a peculiar relation to the public interests that there is superinduced upon it the right of public regulation.'" There seems to us to be nothing at variance with this conclusion in *United States* v. *Cohen Grocery Co.* 255 U. S. 81. The part of the Lever Act there held violative of the guarantees of the Fifth and Sixth Amendments to the United States Constitution are separable from the provisions here invoked. *Ashley* v. *Three Justices of the Superior Court*, 228 Mass. 63, 81, and cases there collected. *Reagan* v. *Farmers' Loan & Trust Co.* 154 U. S. 362, 395. Moreover, it was the intent of Congress as declared by § 22 of the act that no unconstitutional provision therein should taint in any particular other parts not in themselves violative of constitutional guarantees.

The appointments of the fuel administrator and of the fuel committee appear to have conformed to the terms of § 2 of the act and do not in our opinion contravene the provisions of art. 2, § 2 of the Constitution of the United States. It is manifest that the President could not attend in person to the execution of the Lever Act and that he must act through representatives. *Williams* v. *United States*, 1 How. 290, 297. *Wilcox* v. *Jackson*, 13 Pet. 498, 513. *United States* v. *Weeks*, 259 U. S. 326. *West* v. *New York, New Haven & Hartford Railroad*, 233 Mass. 162.

The documents showing the appointment of Mr. Storrow as federal fuel administrator for New England and Massachusetts and his appointment of the members of the Lowell fuel committee were admissible. It thereby appeared at the lowest that they purported to be acting as *de facto* officers of the United States.

These facts and the Lever Act afford the background in the light of which the rights of the parties must be tested. We are of opinion that no liability to the plaintiff is disclosed.

Since Mr. Storrow had no direct connection with the acts of which the plaintiff complains, and in all that he did was undertaking to perform duties imposed by his appointment under the provisions of the Lever Act, the record discloses no ground for liability against him. While performing official duties for govern-

ment he could not be held liable for the acts of his associates or subordinates. *Keenan* v. *Southworth,* 110 Mass. 474. *Robertson* v. *Sichel,* 127 U. S. 507. *Burroughs* v. *Rane,* 241 Mass. 1.

The letters on stationery of the New England or Massachusetts fuel administration with the name of Mr. Storrow printed thereon, but signed by another and not shown to have been sent by his direction or with his knowledge, were excluded rightly. *Butler* v. *Price,* 115 Mass. 578. *Deane* v. *American Glue Co.* 200 Mass. 459, 462. Indeed, the decision of the preliminary question, whether they were written by an authorized agent so as to be admissible against him as principal, rested with the trial court. *Hathaway* v. *Congregation Ohab Shalom,* 216 Mass. 539, 544. *Coghlan* v. *White,* 236 Mass. 165, 168, 169. See *Pilon* v. *Viger,* 198 Mass. 118.

It is apparent from all the testimony that the defendants the fuel committee were striving with the purpose to prevent suffering and hardship, to preserve the public health and to promote the general welfare in Lowell by securing so far as possible deliveries of coal in small quantities to those in imminent need, and to thwart all efforts of one to gain advantage over others by duplicating orders among several dealers or in other ways. In all that they did they proceeded under the presumed authority of the Lever Act. There is no evidence to support a finding that the plaintiff acted under the duress of the defendants either in signing the order to the Boston and Maine Railroad or in selling coal to other dealers or to the public, or in doing other acts pursuant to intimations of the Lowell fuel committee. The utmost extent of the so called coercion, which is relied upon as constituting duress, is that if the plaintiff did not sign the order to the railroad, or make deliveries of coal as requested, the fuel committee said that they would take steps to prevent him from getting coal. This was not a menace to prosecute for a crime. It was not a threat to do anything shown to be illegal or ethically wrong. In their setting the words as used by the fuel committee to the plaintiff naturally would have been intended and understood to mean simply that legal methods to that end would be adopted. There may have been rules and regulations issued by the President under the Lever Act applicable to the situation. While of course purity of motive cannot justify invasion of the rights of others, every

presumption is in favor of legality and of innocence of officers acting as were the fuel committee. In the absence of evidence to the contrary, this presumption prevails. *Duffy* v. *Treasurer & Receiver General*, 234 Mass. 42, 50, and cases there collected. *Bank of United States* v. *Dandridge*, 12 Wheat. 64, 69, 70. *Sunday Lake Iron Co.* v. *Wakefield*, 247 U. S. 350, 353. It was stated in *Morse* v. *Woodworth*, 155 Mass. 233, 250, that "The rule as to duress *per minas* has now a broader application than formerly. It is founded on the principle that a contract rests on the free and voluntary action of the minds of the parties meeting in an agreement which is to be binding upon them. If an influence is exerted on one of them of such a kind as to overcome his will and compel a formal assent to an undertaking when he does not really agree to it, and so to make that appear to be his act which is not his but another's, imposed on him through fear which deprives him of self-control, there is no contract, unless the other deals with him in good faith, in ignorance of the improper influence, and in the belief that he is acting voluntarily. . . . It has often been held that threats of civil suits and of ordinary proceedings against property are not enough, because ordinary persons do not cease to act voluntarily on account of such threats." That principle, applicable to the facts here disclosed, shows no liability on the part of these defendants connected with the United States fuel administration. *Wilcox* v. *Howland*, 23 Pick. 167. *Harris* v. *Carmody*, 131 Mass. 51. *Fairbanks* v. *Snow*, 145 Mass. 153. *Bryant* v. *Peck & Whipple Co.* 154 Mass. 460. *Silsbee* v. *Webber*, 171 Mass. 378. *United Shoe Machinery Co.* v. *La Chapelle*, 212 Mass. 467, 477. *Anthony & Cowell Co.* v. *Brown*, 214 Mass. 439, 442. *Stevens* v. *Thissell*, 240 Mass. 541. *United States* v. *Huckabee*, 16 Wall. 414, 431, 432. *United States* v. *Child & Co.* 12 Wall. 232. *Gaar, Scott & Co.* v. *Shannon*, 223 U. S. 468. *Ward* v. *County Commissioners*, 253 U. S. 17, 23.

So far as the plaintiff's right of action rests on the reconsignment of carloads of coal consigned to him, its foundation is gone if the order of January 1, 1918, signed in his name by his son directing the railroad to deliver to the order of the fuel committee all shipments of coal consigned to him, is binding on him. It is plain that the failure of the plaintiff to renounce this order at any time, although knowing of it forthwith, and his sending of bills for the

coal to the persons to whom it was so reconsigned and acceptance of payment therefor, constituted a ratification and confirmation by acquiescence and consent even if its signing was not originally authorized. The plaintiff was free to deliberate and take his own course whether to abide by the order signed by his son, or to repudiate it, or to withdraw it at any time. By its own terms it was to continue in force only "until further notice" by the plaintiff. The opportunity for reflection as to his course was instant, ample, unconstrained and without compulsion in any legal sense. The duty rested on the plaintiff as principal, when informed of the act of his agent, to dissent and given notice of his dissent within a reasonable time; otherwise his approval would be inferred. *Brigham* v. *Peters*, 1 Gray, 139, 147. *Murray* v. *Mayo*, 157 Mass. 248. *Webb* v. *Lothrop*, 224 Mass. 103, 105. In any event his conduct is a bar to complaint by the plaintiff as to acts performed in good faith by the defendants, the fuel committee, in reliance upon the order.

No cause of action is shown based upon the prices of coal fixed by the fuel committee, nor the quantities in which it was sold. Whether the prices thus fixed were valid or void is immaterial. The plaintiff voluntarily and without coercion throughout the period here in question sold his coal at these prices. It was said in *Morrisdale Coal Co.* v. *United States*, 259 U. S. 188 (a case under the Lever Act), "If the law requires a party to give up property to a third person without adequate compensation the remedy is, if necessary, to refuse to obey it." *Pine Hill Coal Co. Inc.* v. *United States*, 259 U. S. 191. That statement applies with even greater force to directions given by a subordinate governmental officer. If the plaintiff doubted the authority of the defendants or their rights in the premises, his remedy was to decline to comply with their suggestions, rather than to obey without protest, and then seek to hold them responsible in damages for his losses which in fact flowed from deliberate and free submission to such suggestions.

No cause of action is disclosed on this record against the defendants who are coal dealers. The plaintiff made no objection whatever to their coming upon his premises and getting coal. He treated every transaction to which they were parties as a sale of chattels, sent them bills for the amount claimed and accepted

their payment in settlement. This was an affirmation of the incident as that which on its face it appeared to be, namely, a simple sale closed by delivery and payment. *Foster* v. *Rockwell*, 104 Mass. 167. *Auringer* v. *Cochrane*, 225 Mass. 273.

The plaintiff kept a place of ordinary trade and impliedly, according to present conventions, invited the public to come and deal with him, in the absence of conduct manifesting a contrary purpose. There is no foundation for an action of trespass. *Lakin* v. *Ames*, 10 Cush. 198, 220. *Riley* v. *Harris*, 177 Mass. 163. *Blease* v. *Webber*, 232 Mass. 165.

It follows without further discussion from what has been said that in our opinion there was no evidence tending to show conspiracy between these defendants. *DeWolfe* v. *Roberts*, 229 Mass. 410. *Attorney General* v. *Tufts*, 239 Mass. 458, 493, 494.

The controversy between the plaintiff and the defendant Cawley as to the weight of one carload of coal sold to the latter cannot be adjudicated in this form of action.

The ruling excluding the testimony of the expert rested in the discretion of the court, which is not shown to have been abused. *Coghlan* v. *White*, 236 Mass. 165, 169.

It is not necessary to discuss further the exceptions taken to the admission or exclusion of evidence. No error is disclosed.

*Exceptions overruled.*